IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


DAVID H. WARNER, III,

        Plaintiff,

vs.                                        CASE NO. 1:14-cv-228-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

        Defendant.

_____ /

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for supplemental security income benefits ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). (ECF No. 1.) The Commissioner has answered (ECF No. 9), and both parties have filed briefs outlining their respective positions. (ECF Nos. 12, 13.) For the reasons discussed below, it is recommended that the Commissioner's decision should be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for (SSI) under Title XVI on May 23, 2011. (R. 140–46.) Plaintiff, born on August 28, 1993, received SSI based on disability as a child under the age of eighteen beginning on January 1, 2000. (*Id.*) As required by law, eligibility for Plaintiff's SSI was to be redetermined when Plaintiff reached the age of eighteen. (R. 72–76.) Plaintiff's application was denied initially and upon

reconsideration, finding that Plaintiff was no longer disabled as of April 2012. (R. 72–76, 82–93.) Plaintiff requested a hearing with an administrative law judge ("ALJ"), which was held on May 28, 2013. (R. 95, 105.) On July 26, 2013, the ALJ issued a decision unfavorable to Plaintiff. (R. 18–28.) The Appeals Council then denied Plaintiff's request for review on October 10, 2014. (R. 1–3.) On December 9, 2014, Plaintiff filed the instant appeal to this Court. (ECF No. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding

that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to

---

[1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise specified.

do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion." *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation."). In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment. *Walker*, 826 F.2d at 1003.

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform. *Wolfe*, 86 F.3d at 1077–78. Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence. *See id.* Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner. *Hale v. Bowen,* 831 F.2d 1007, 1011 (11th Cir. 1987).

## III.  SUMMARY OF THE RECORD

### A.    Background

Plaintiff was nineteen years old as of his administrative hearing on May 28, 2013. (R. 40.) Plaintiff completed high school and was briefly enrolled in college courses at Santa Fe College in Gainesville, Florida. (*Id.*) However, he withdrew from college because he was unable to finish the semester due to his psychiatric issues. (R. 596.) Plaintiff has never held a job where he worked for a year's period of time and earned full-time income. (R. 40.) However, Plaintiff worked at a local senior center during the summer while he was in high school. (R. 327, 522.)

### B.    Medical Evidence Considered By the ALJ

Plaintiff was admitted to Vista South under the Baker Act for destroying property in his family's house on December 17, 2010. (R. 304.) Plaintiff was seventeen years old at the time and had exhibited escalating behaviors over the previous two months. (*Id.*) Plaintiff had a conflictual relationship with his father and a recent breakup with his girlfriend. (*Id.*) Hospital notes disclose that Plaintiff required multiple sedation attempts, four point restraints due to physical aggression and attempts to escape, and hyper-sexual behavior with some of the staff. (R. 304–05.) Plaintiff was prescribed Depakote and Risperdol and diagnosed with Bipolar disorder type 1 and Acute manic episode. (R. 304–06.)

Meridian Behavioral Healthcare took over Plaintiff's care in 2011 and developed a treatment plan for Plaintiff. (R. 495–551.) Plaintiff's records evidence that Plaintiff may not have been completely compliant with his treatment plan and that he would not take

his medication or wean himself off the medication when he felt like he was doing well. (R. 460–91, 495–551.)

In late 2011, Meridian doctors prescribed Lamictal, which resulted in Plaintiff being less irritable and having less temper tantrums, and his mother reported that he was doing well. (R. 495–551.) On April 24, 2012, Shumin Zhang, M.D. at Meridian completed a mental status report which stated that Plaintiff's mood was stable, his concentration was fair, though he had difficulties getting started on tasks, and that Plaintiff had decreased motivation. (R. 492–94.) Dr. Zhang also opined that Plaintiff was unable to sustain work activity eight hours per day, five days per week. (*Id.*)

On April 28, 2012, Plaintiff saw William Beaty, Ph.D., for a consultative psychological evaluation on behalf of Disability Determination Services, at which Plaintiff stated that his condition had stabilized with medication. (R. 554–57.) Plaintiff reported a variety of daily living activities and social activities, and stated that his understanding, memory, sustained concentration, and task persistence were "okay." (*Id.*) Dr. Beaty's mental status examination revealed that Plaintiff's mood was normal, his affect was constricted and flat, his attention was intact even though he displayed poor insight and abstractive ability, and his memory was intact. (*Id.*) Dr. Beaty diagnosed Plaintiff with bipolar disorder, not otherwise specified, and anxiety disorder, not otherwise specified, and assessed Plaintiff's global assessment of functioning ("GAF") as 65. (*Id.*)[3]

---

[3] The ALJ noted, "[b]ased on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision (DSM-IV-TR), a GAF of 65 constitutes some mild symptoms or some difficult in social, occupations, or school functioning." (R. 23.)

On December 27, 2012, Meridian case manager John Collins reported that Plaintiff required ongoing SSI benefits to receive mental health treatment in order to manager his symptoms. (R. 594.) Plaintiff then enrolled in college at Santa Fe College, but was missing school a lot, was stressed, and had difficulties doing his school work. (R. 597–623.) On March 1, 2013, Jing Liu, M.D., Staff Psychiatrist at Meridian, wrote a letter to Santa Fe asking his professors to excuse his absences due to a change in medication and that it was Dr. Liu's recommendation that Plaintiff was ready and capable of returning to classes with regular attendance. (R. 595.) However, on March 18, 2013, Dr. Liu wrote a letter to Santa Fe requesting a medical discharge for Plaintiff "due to [Plaintiff's] mania and intermittent episodes," which rendered him "unable to focus and finish his classes productively." (R. 596.)

On April 17, 2013, Meridian records disclose that Plaintiff was using marijuana and alcohol, that his thought process was delusional and grandiose, that his speech was over-productive and pressured, and that he had auditory hallucinations. (R. 597–601.) Plaintiff was advised to stop using marijuana and Zyprexa was added to his medications. (R. 610.) The next day, Plaintiff was admitted to the crisis stabilization unit ("CSU") at Meridian with symptoms of mania. (R. 605.) Plaintiff's CSU records note a use of marijuana and pain pills and that Plaintiff had been non-compliant with his psychiatric medications in the past. (R. 602.) Plaintiff's behavior and mood stabilized and he was discharged from the CSU on April 25, 2013. (R. 606.)

On May 15, 2013, Plaintiff was again admitted to the CSU after his mother weaned him off his prescribed Seroquel medication, against Frank Anthony, M.D.'s

explicit advice. (R. 630–33.) Dr. Anthony noted Plaintiff's poor history of medication compliance due to his mother's influence and noted that it was exacerbated by Plaintiff's recent methamphetamine use. (*Id.*) Plaintiff's urine drug screen was positive for methamphetamines, marijuana, and benzodiazepines. (*Id.*) Once Plaintiff restarted Seroquel, his conditions improved and stabilized and he was discharged from the CSU on May 18, 2013. (R. 630–34.)

### C.    Opinion Evidence

On April 30, 2012, Kevin Ragsdale, Ph.D., a Disability Determination Services consultant, completed a Mental Residual Functional Capacity Assessment of Plaintiff to determine Plaintiff's capacity to sustain mental activity over a normal workday and workweek on an ongoing basis. (R. 572–75.) Dr. Ragsdale opined that notwithstanding his limitations, Plaintiff is able to comprehend and remember concepts, processes, and instructions fundamental to basic job tasks. (*Id.*) Further, Dr. Ragsdale opined that Plaintiff is able to be attentive for two hours at a time while he is completing solitary work assignments and is able to adequately function in a work environment with infrequent, brief, and superficial contact with the public, co-workers, and supervisors. (*Id.*)

Then on June 12, 2012, Steven Wise, Psy.D., another Disability Determination Services consultant, completed a second Mental Residual Functional Capacity Assessment of Plaintiff. (R. 590–93.) Dr. Wise opined that Plaintiff has marginal personal skills and would do best with minimal social demands. (*Id.*) He further noted that Plaintiff's medications seemed fairly effective in helping him cope with his anxiety

and affective issues. (*Id.*)

### D.   Hearing Testimony

At Plaintiff's hearing on May 28, 2013, Plaintiff admitted to previously using marijuana and stated that he stopped two months prior because he was on probation. (R. 40–42.) Plaintiff testified that he used pain medications because he had previously been prescribed them for an ankle injury. (*Id.*) Plaintiff also admitted that at times he would take his medication and then smoke marijuana afterwards, that he weaned himself off some of his medications, and that he was noncompliant with some medications. (R. 45–46.) According to Plaintiff, he was noncompliant with some of his medications because of his mother's and aunt's influences and opinions about Plaintiff not needing some of the medications, specifically the Depakote. (*Id.*) Thus, although Plaintiff's physicians prescribed the medications, Plaintiff believed that the medications were not in his best interest. (*Id.*) However, Plaintiff testified that now he had the medications he needed he did not use alcohol or marijuana. (R. 45.)

Plaintiff stated that Meridian helped him the most and that things were going well so he should be able to succeed in school and he planned on re-enrolling once he was stable on his medications. (R. 42–43.) However, Plaintiff testified that he was not able to control his anger enough to function at a job and that he cannot hold a job. (R. 44.) Nonetheless, Plaintiff was performing community service hours with the housing authority as part of his probation requirements from 7:30 A.M. until 4:30 P.M. (*Id.*) Otherwise, Plaintiff typically spends the day at home watching television, reading, or taking care of his hamster because he does not have a vehicle or license. (R. 47–48.)

Plaintiff asserted that he is someone that does not want to give up and that he wants to complete his community service hours so he can have a bright future. (R. 49–51.)

At Plaintiff's May 28, 2013 hearing, the ALJ posed two hypotheticals to Vocational Expert Ms. Mancini ("VE"):

> Q. Ms. Mancini, I'm going to give you two hypotheticals. Both hypotheticals involve a younger individual with a high school degree, with no past work history. This Claimant has testified that due to his bipolarism, his panic attacks, anxiety and also from being OCD that he believes he is unable to work. He has focused on his inability to maintain proper social behavior at work. He has described arguments with people and sometimes feeling angry at people and being unable to control that. So I view hi[s] comments in that area as being marked. He's also indicated that he cannot stay focused at times, cannot concentrate. He worries about things, gets in panic modes and again, I view his remarks in that area also as marked. If someone has marked restrictions in either socialization . . . or pace, persistence or concentration, can they be competitively employed?
> A. No, Your Honor.
> Q. All right. For the second hypothetical, please consider the following, that he can do sedentary, light, medium, heavy work. So cover all the four bases of work, can do it for eight hours a day. I would exclude ropes, ladders, and scaffolds, heights and dangerous machines, but physically opened up to four areas. However, he would need no production pace demands with infrequent contact with co-workers, the public and supervisors. In other words, he should work with things more than people and co-workers, With those restrictions, would there be any work available?
> A. There would be, Your Honor.[4]

(R. 60–61.) Plaintiff's attorney then examined the VE:

> Q. Ms. Mancini, let's stick with the second hypothetical, but let me ask you a question before we move forward, which is what percentage of the workday is everyone allowed to be off task?
> A. Ten, no more than fifteen percent of the workday.
> Q. So would I be correct in understanding from your answer that

---

[4] The VE subsequently gave three examples of available positions: 1) commercial cleaner; 2) hospital cleaner; and 3) housekeeper cleaner. (R. 61–62.)

employers expect that between six and nine minutes an hour, people will be off task?

A. For the most part. And that would accompany maybe changing from one task to the other, maybe taking a quick break, that kind of situation. People don't constantly work every minute of the workday.

Q. I understand. So for our purposes in this hypothetical, in addition to the six to nine minutes an hour that everybody's expected to take, because of mental health issues, our hypothetical person would need another six to nine minutes an hour over the course of the workday. Would employment be available to that person in any one of these three jobs?

A. No, that would be an excessive amount of off task behavior.

Q. Would you say that that would be an unreasonable number and length of rest periods?

A. Unreasonable?

Q. Unreasonable.

A. Yes, that would be unreasonable and based upon that increased amount of off task behavior, there would be not -- if a person had the job, they would be in jeopardy of losing it. And then there would be no[] other work available.

Q. Let me ask you about the issue of maintaining regular attendance and being punctual within customary tolerances. What are customary tolerances?

A. One, no more than two, either absences, tardiness or -- absences or tardiness in a 30-day period.

Q. So if we take Judge McGarry's second hypothetical and just add that the person would have three or more absences or tardiness per month for mental health reasons, would any of these jobs remain available?

A. No.

Q. And would any other jobs in the national economy remain available?

A. No. There would be no work available based upon the excessive absenteeism.

(R. 62–64.)

### E.    The ALJ's Findings

The ALJ found that since April 1, 2012, Plaintiff had two severe impairments: (1)

bipolar disorder; and (2) anxiety disorder. (R. 20.) The ALJ further found that Plaintiff's

impairments and combination of impairments did not meet a listing. (*Id.*) As a result, the

ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a

full range of work at all exertional levels with the following limitations: avoid

ladders/ropes/scaffolds, heights, and dangerous machines, and no production pace

demands. (R. 22.) The ALJ also noted that Plaintiff should have infrequent contact with

co-workers, supervisors, and the public, and should work with things more than people

and co-workers. (*Id.*)

In determining Plaintiff's RFC, the ALJ found that although Plaintiff's "medically

determinable impairments could reasonably be expected to cause the alleged

symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely credible . . . ." (R. 25.) The ALJ noted that

she gave great weight to Dr. Ragsdale and Dr. Wise's opinions that Plaintiff is not

precluded from performing all work activity, and noted that this was consistent with

Plaintiff's overall record, specifically in that despite his mood disorder, he was able to

return to high school and graduate when motivated to do so. (R. 26.) The ALJ further

noted that she gave little weight to Dr. Liu's opinion as to Plaintiff's ability to attend

college due to his mood disorder because Dr. Liu initially said that Plaintiff was able to

attend school and then withdrew his opinion which appeared to be at Plaintiff's request

and was inconsistent with mental status examinations. (*Id.*)

Moreover, the ALJ found that Plaintiff's testimony regarding his mental inability to

work was not entirely credible in light of the medical evidence on record, which showed

that Plaintiff had a good response to treatments and that his symptoms have decreased

to a point where he could function well, as evidenced by his ability to finish high school. (*Id.*) The ALJ noted that the medical evidence demonstrates that when Plaintiff stops taking his medications, and when Plaintiff partakes in substance abuse, his condition deteriorates and his mental health symptoms increase. (*Id.*) Additionally, the ALJ found that Plaintiff's credibility regarding the limitations his mood disorder caused was questionable given his ability to perform a wide variety of daily living activities. (*Id.*) The ALJ further found that Plaintiff "is immature and appears to rely on his mental health history as a reason he cannot work, although he plans to do his probation to avoid incarceration." (*Id.*) Finally, the ALJ noted a lack of evidence that Plaintiff cannot do physical work and that although Plaintiff is somewhat isolated due to lack of transportation, he engages in activities all day long. (*Id.*) Thus, the ALJ found that the record "simply fails to support a conclusion that the claimant is precluded from performing all work activity." (*Id.*)

The ALJ also found that since April 1, 2012, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 27.) In making this determination, the ALJ relied on the VE's testimony that given the Plaintiff's age, education, work experience, and RFC since April 1, 2012, that Plaintiff would be able to perform the requirements of representative occupations such as commercial cleaner, hospital cleaner, or housekeeping cleaner. (*Id.*) Consequently, the ALJ determined that Plaintiff's "disability ended on April 1, 2012, and the claimant has not become disabled again since that date." (*Id.*)

## IV. DISCUSSION

Plaintiff argues that the ALJ erred by not posing a hypothetical question to the VE at Plaintiff's administrative hearing that included all of Plaintiff's limitations arising from his impairments. (ECF No. 12 at 1.) "In order for a Vocational Expert's testimony to constitute substantial evidence, the ALJ must post a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). Plaintiff asserts that this "in turn means that the hypothetical must include all of the limitations arising out of all of the claimant's impairments." (ECF No. 12 at 12.)

Plaintiff is partially correct that the hypothetical must include all of the limitations arising out of the claimant's impairments; however, the limitations that must be included in the hypothetical are *documented* limitations. *See Richter v. Comm'r of Soc. Sec.*, 379 F. App'x 959, 960 (11th Cir. 2010). The hypothetical question need not include all of a claimant's symptoms that either are not supported by the medical records or that were alleviated by medication. *Ingram v. Comm'r of Soc. Sec. Admin.,* 496 F.3d 1253, 1270 (11th Cir. 2007); *see also Crawford v. Comm'r of Soc. Sec.,* 363 F.3d 1155, 1161 (11th Cir. 2004) (an ALJ is not required to include findings in her hypothetical posed to a VE that the ALJ properly rejected as unsupported).

Plaintiff contends that the ALJ's hypothetical "failed to assume the existence of psychological problems, which the ALJ had found at step two to be severe, [thus] the decision was not based on substantial evidence." (*Id.*) At Step Two, however, the ALJ found that Plaintiff had two severe impairments: 1) bipolar disorder; and 2) anxiety

page number

disorder. (R. 20.)  These impairments were indeed included in the ALJ's hypothetical to the VE.[5]

Plaintiff further argues that the ALJ's hypothetical failed to include Plaintiff's "moderate inability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; a moderate inability to accept instructions and respond appropriately to criticism from supervisors." (*Id.* at 13.)  As Defendants point out, however, "the ALJ did not find that Plaintiff had such moderate limitations in his functioning, whether at Step Two or elsewhere in the sequential evaluation." (ECF No. 13 at 5.) Instead, the ALJ also found that Plaintiff "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . ." (*Id.*) The ALJ found "no indication of mental limitations in the performance of his normal activities of daily living when so motivated," and "no indication the claimant is unable to maintain appropriate social relationships on a limited basis when so motivated."  (R. 21.)

With regard to concentration, persistence or pace, the ALJ determined that the claimant has moderate difficulties but found that when Plaintiff "is compliant with his medications, mental status examinations are largely unremarkable for objective evidence of distinct limitations in communication, understanding, comprehension,

---

[5] The ALJ's hypotheticals involved a claimant with "bipolarism" and "anxiety." (R. 60.)

concentration, or memory functioning." (*Id.*) Thus, the ALJ's findings regarding Plaintiff's concentration, persistence, and pace did not need to be included in the hypothetical, as the ALJ found that they were alleviated by medication. *See Ingram,* 496 F.3d at 1270.

Moreover, Defendants correctly point out that Plaintiff has not presented any medical evidence establishing that he is indeed off-task for at least ten minutes per hour or would likely be absent three or more days a month for mental health reasons. (ECF No. 13 at 7.) Thus, the ALJ was not required to include in her hypothetical posed to the VE the limitations Plaintiff alleges were erroneously omitted because the ALJ properly rejected the limitations as unsupported by the record. *See Crawford,* 363 F.3d at 1161.

Accordingly, the Court finds no error in the ALJ's hypotheticals to the VE. Further, Plaintiff has not shown that the ALJ's decision was not based on substantial evidence. Therefore, the Commissioner's decision is due to be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 21st day of October, 2015.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen**

**(14) days after being served a copy thereof.** <u>**Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**</u> **A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.